Your duty in that capacity is essential to the functioning of federal courts and we appreciate your service. It's my honor, Your Honor. Thank you very much. May it please the court, counsel, my name is Tom Cogley and I represent the appellant in this case, Mr. Stanley Schily. In my time here today, I hope to convince you that you should reverse the district court's decision to deny my motion for a judgment of acquittal because the government did not approve its case beyond a reasonable doubt that my client had committed the crime of conspiracy to distribute methamphetamine. This case began on March 5, 2020, when law enforcement executed a search warrant at my client's residence. He was removed from the home and he ultimately gave a statement to Detective Al Bowley while his home was being searched. Now very little was actually found inside of the home as a result of the search. I think in the basement, there was less than a gram of methamphetamine. On a workbench nearby, there were some plastic baggies and a note. The plastic baggies had no traces of methamphetamine on them. They were, in fact, a group of, I think, 100 baggies inside a larger package that's typically utilized for jewelry or tools or things like that. Wasn't there testimony, though, from the government expert that it's also used for distribution of narcotics? Absolutely, Your Honor, and I didn't want to mislead the court. I was getting to that to be in candor. It is sometimes utilized for that as well. Next to or near those baggies was a note, and the note read, it appeared to be addressed to my client. It said, Stan, I went home for now. This is 21G. I took 3G only. We need to talk about getting me some cash on top. He's going to make it right the next time that he delivers to us. The last piece of critical evidence, I think, that was utilized at the trial was found in an upstairs bedroom, and it was another note, a handwritten note that indicated some names of some individuals in the community as well as some amounts and dollar amounts as well. It's like a pretty classic pay-oh sheet, doesn't it, when you look at it? It does, Your Honor, but the issue that I take with both of those two documents, and I'll deal with the oh sheet that you talked about first, there's no indication who wrote that. There's no indication of a time or a date on it. Again, in candor, I'm speculating here, but I think that in one of the names, there's 11-17. Presumably, that could mean November 17th, but again, there's no date, certainly no indication that corresponds with the time frame contained in the indictment, and I don't believe it was my client's bedroom that it was found in. Well, let's talk about what I guess I would say is called maybe the elephant in the living room. What about the confession? Yes, Your Honor. So my point of view and my take on that interview, and I went back and listened to it in preparation from the argument for this argument, is the same as it was during the trial. There's a difference between a defendant confessing to a crime and a law enforcement officer asking him questions like, you were getting an ounce a week or more right, him saying no, and the officer saying or getting upset with him for lying. And I think that type of technique was utilized throughout the interview by Detective Boley. If we look at, for instance, the question that he asked my client, have you ever dealt methamphetamine? And my client, the best answer that he gave him for the government was, I guess, I don't know. Now, here's my problem with that. Mr. Boley never provided a time frame for that question. It was just a broad question, have you ever done this? Now, my client had a prior conviction for distribution of methamphetamine, and so it's entirely possible that he's answering that question, thinking back through his whole life. Well, it may be possible, but we give great deference. There was a jury verdict here. Jury could judge that confession, assign it whatever credibility it wanted. Presumably, I don't recall if you argued, you were trial counsel here, but trial counsel could have made that argument to the jury, and in fact, here they convicted. So I guess that's my problem. When you combine the confession with the other evidence, I just think it's a hard barrier for you to get around. Your Honor, I understand what you're saying. Respectfully, I would disagree, because the jury is left to speculate on when he's distributing that methamphetamine. It knows that he's distributed it at some point in time because it's got a prior conviction that came into evidence, but there's nothing from that conversation that would establish that it happened between January 1st of 2019 to March 5th of 2020. The jury had to fill in that gap or speculate in order to reach the conclusion that he was guilty of this crime. I think when we talk about what that interview with my client actually proved, I think it definitely proved that he conspired to possess methamphetamine. I think it proved that he was friends with a guy named Knutson, and that Knutson would travel somewhere to meet with this individual named Jay. This individual named Jay would provide Knutson with some methamphetamine. He'd travel back to the Mobridge area. He'd keep some for himself, and he would give the rest to my client. The other note that was found suggests just that. He came and delivered 20 grams of methamphetamine to my client. He kept three for himself as payment, and he left the balance there. It's the analogy that I used at trial, and I think it's still appropriate, Your Honor, is if you and your friend go to McDonald's and you give him money to go up and buy you a soda, and he takes your $2 and he goes up and buys a 20-ounce soda, and then he brings it back to you and he takes a drink out of it and gives it to you and says that that drink was his payment for the methamphetamine, that doesn't make you a distributor of Coca-Cola. I think I got a little bit sidetracked, but I think you follow my logic. Stanley overpaid this Knutson for his meth, but that doesn't make him a distributor of meth. The government in its brief cited, I think, three different examples of the interview which it purports to claim that my client admitted to distribution. I went back and listened to that interview, as I mentioned, and none of the citations actually coincide with that. The first citation was just the officer reading my client's rights. The second one was my client talking about his relationship with Knutson, and then the last one was talking about these deliveries between Jay and Knutson, and Knutson taking and getting a couple of balls as payment. When you couple those three citations with the fact that it's just not clear what he's admitting to or when he's admitting to distributing methamphetamine, I don't view it as a confession that proves that he's guilty of a crime of distribution. If we go back to the note, the note that was found near the methamphetamine doesn't contain any evidence of distribution on the part of my client. It contains evidence that he presumably received 20-some grams of methamphetamine and that the writer of the note kept 3 grams for himself, and the next time he did it for my client, my client had to pay him more. That's proof that my client obtained or possessed methamphetamine, but it's not proof that he distributed or entered into a conspiracy to distribute methamphetamine. We didn't have the evidence of Jay, we didn't have the evidence of Knutson, none of those individuals testified at the trial about my client's participation in this scheme. All we have is those two notes, a small amount of meth, and my client's conversation with Detective Bowley. When we look at the claim of the government that it happened between 2019 and 2020, and again the portions of the interview that are cited in the brief, they don't again coincide with this idea that this happened in 2019 and 2020. The last cited excerpt is the longest, and it's the officer feeding my client information about this Jay individual and trying to pin my client down about how often Jay was coming to town and how often my client was buying from him. And eventually they do establish, I think in all candor, a timeframe of the first of the year. Presumably in the context of that conversation, they're talking about the first of January, but again, it's a conversation in the context of the interview about my client purchasing methamphetamine from or through this Jay individual, not about my client participating in any conspiracy with this Jay individual. It's about, it proves that he committed a crime, it proves that he was receiving methamphetamine, but it does not prove that he was participating in a conspiracy to distribute. And that's the issue that I take with the jury's verdict overall, is that it had to figure out who was participating in the conspiracy and when the alleged conspiracy was taking place. And I think this court, although it does give a great deference to the jury's verdict, it also has vacated convictions when it felt that the jury was left to speculate. And that happened in the Carper decision that I cited in my brief. Well, the quantity levels here, like a couple of different times, there were two eight balls, a quarter ounce, right? That's not, I mean, that's a pretty huge user quantity as a general principle, right? I mean, well, not customarily. I mean, most guys getting quarter ounces are selling something, right? And did the jury have before it any evidence in which they could draw any conclusions from the quantities that were being delivered and how frequently they were being delivered? I'm thinking, Judge, the closest thing that comes to mind is that Detective Bowley did testify to just that, that the amount of methamphetamine that he was receiving is not ordinarily the level or the amount that a personal user would have in their possession or purchase. You know, ordinarily, if we look at distribution, it's distribution and it doesn't matter whether you're, you know, if you can distribute, you know, like, you know, there's this conceivable a guy may be just well-to-do and he's getting quarter ounces and having parties for all his friends, right? It doesn't happen very often. There's no question there. Never mind. Go on. Well, Your Honor, to your point, and I think in a large respect, that's maybe some of what was going on in Mr. Shealy's life at that time, but again, when we go, if you look at the questions, for example, one of the questions that was asked by Mr. Bowley of my client was he was referring to another user in the area. And he said, how much, how many times, he was referring to three-quarters of an ounce. And he said, how much with that other user have you shared, fronted, or bought or purchased? That's three different, very different things, especially in the context of a conspiracy to distribute methamphetamine. Sharing is one thing. Fronting is certainly another thing. But buying, and without Detective Bowley going further and trying to ascertain what exactly my client did there to distribute, my client could have answered yes to that question and only been referring to the buying portion of that question, and he would have been being honest. But the jury would have had to speculate that it was going, that it was taking place in this sort of the sharing or the fronting. I see, Your Honors, that I've reached my rebuttal time, and so I will reserve the remainder of my time. Thank you. You may. Thank you. Mr. Kohler? May it please the Court, my friend, Mr. Cogley, I'm Kevin Kohler from the U.S. Attorney's Office in South Dakota, representing the government. We are here asking that this conviction be affirmed. Judge Molloy, as you said, the elephant in the room here is this interview and this confession. With due respect to opposing counsel, we disagree quite strongly on what was said in this interview. It's Exhibit 1. The Court can listen to it for itself. It's about 30 minutes long. When I listen to that interview, I hear Mr. Sheely admitting ultimately to getting regular shipments that he intended to be an ounce five different times. Now, like many interviews like this, it evolves. It starts with him first minimizing his participation. Sure, the officer tells him, I don't believe you. He uses the word BS. He says, I think this is, you're lying. This isn't a rough interrogation. He's Mirandized before it starts. He's told he's going to be free to leave at the end. He is free to leave at the end. At the end of this, Mr. Sheely offers to make the officer coffee. I mean, that's the tone of the interview. And each time he starts to give admissions, the officer presses him on it. And ultimately, by the end of the interview, he's admitting that he works with a person named Knutson. They get methamphetamines from someone named Jay. They each take a cut, it sounds. And then he fronts methamphetamines. He talks about middling drugs, about, I looked at the transcript of the interview that was a demonstrative exhibit, but it's about a third of the way in. He talks about how he was, Knutson paid me for it if he sold any. And he says he still owes me 400 bucks. So as of the day of that interview, he's owed 400 bucks for meth Knutson got from him that he went out and apparently sold. He talks about someone named Lance. He admits that Lance is middling for him, in the words, I think, of the detective. And he says, yeah, I just brought over $200 the other day. So we cited the Shaliti case from 2020. They are one of the indicia of a conspiracy to distribute methamphetamines, is fronting. Not surprisingly, if you're getting quantities, you're giving them to someone else, they're selling them, bringing you money, there's a conspiracy to distribute methamphetamines. He also talks about a number of people that he's selling directly to, Knutson, this Lance individual. Lance, he says he'd get 15 grams to 20 grams. This guy named CJ Overby, five times, he said, I sold him a quarter gram to a full gram. He even gives the prices that he charges, $35 for a quarter gram, up to 150 bucks per gram. What about counsel's argument that there's no evidence of the timing of this conspiracy and that he had a prior conviction that could have been related to, could have been related to something else? Yeah. There again, I just don't think there's any ambiguity when you listen to that interview. First of all, it starts off, he says, when did you last use? He says, yesterday. Then he's asked directly, since the first of the year, where have you been getting it from? That's when he says, from Jay. He says, yeah. That's just five pages into the transcript, so right near the beginning. Then he's later, just a few minutes later, asked, well, when were you getting it? He says, since the beginning of the year. This is March of 2020, clearly a reference to January of 2020. He says, you're getting about one delivery per month. He's asked, how much did Knutson pay you since the first of the year? That's again, just in the first third of the interview. That's when he says, he still owes me 400 bucks. He paid me some. Then the interview shifts and the detective asks, what about last year, since January of 2019, who were you getting it from? That's when he brings up that, well, yeah, I used to be getting it from Lance, he says. In 2019, that would be from Lance. In fact, that's a quote from the defendant, 2019 would be like from Lance, end quote. He also talks about, in that interview, how this goes to this question of, well, why wasn't there more stuff found in the house? Well, he says, someone stole my scale just the other day. He says, someone stole meth from me on Saturday. In other words, this is a conspiracy that's going on right up to the point of this interview. That's another reason why more stuff wasn't found in the house. This was initially indicted as a conspiracy starting in January 1st, 2020. It was superseded to include this 2019. I don't think there was any ambiguity about the timeframe. It's fairly clear when you listen to that interview. Judge Kobus, you asked about baggies and can these be used for other things. It's true that there was testimony from our expert. Mr. Shealy said himself in that interview, he's asked, how do you package it up? He says, I use little baggies. Sure enough, they're found there in the house. This isn't speculation about what the baggies were used for. He told us that that's how he packages methamphetamines. The interesting things about the notes, who wrote them, what time, what date, what's interesting is he says, I sold some meth to CJ. What's the name on one of those notes? CJ. He denies, by the way, that he sold to a woman named Amanda. He said, I shared with her at times. What's one of the names on that note who owes money apparently with a dollar amount next? It's Amanda. By the way, the weight amounts on that note correspond directly with the dollar amounts in terms of what he told the detective he charges. So this corroborated the things that were said. That note about we received 21 grams, I took 3 grams, that also is consistent with what he said. An ounce of methamphetamines is 28.5 grams. He said, I was getting a little short of an ounce when I ordered an ounce, and then Knutson would take some. So there's a note saying, I took 3 grams, here's 21 grams. Judge Erickson, you asked about the amounts here. You know, this Court has dealt with this question of what amount of meth rises to a reasonable inference that someone is possessing with the intent to distribute. Many times, just yesterday, the Court issued opinion, U.S. v. Anthony Story, from my district, 37 grams I think there the Court held was sufficient. Fetters, a case that we've cited in the briefings, 11.73 grams was sufficient. Fetters itself, cites U.S. v. Vega from 2012 there, 8.6 grams was sufficient in dish of distribution. Shellady cites to U.S. v. Fang, that's 25 grams there, in small baggies, by the way, in dish of distribution amounts. You know, here we have 5 ounces and, you know, do the math, well over 100 grams. If the Court wants a perspective on what less than a gram of methamphetamines looks like, there's a photograph in evidence here of .64 grams. As someone who doesn't deal with drug cases all the time, I frankly found it shocking  That's not, it doesn't matter what I think, but I think there's a reasonable inference that a jury can make based on that evidence that it saw. Those are the main points that I wanted to cover with this Court. We believe that there is more than sufficient evidence to convict in this case. You know, frankly, this is what a meth conspiracy in small town South Dakota, rural America looks like. People getting small amounts distributed to them, larger amount comes into town and, you know, folks show up to a house and buy a small amount of meth. So the government asks that this Court affirm. Thank you. Thank you. Mr. Cogley, your rebuttal. May it please the Court, just a couple of points on rebuttal. Starting with the O-sheet, it was interesting to hear Mr. Colliner refer to Amanda and my client talking about never selling to her but sharing with her, but then her name showing up on the O-sheet with an amount next to it. Frankly, I think that's evidence that my client didn't write the O-sheet. If that indicates that she purchased methamphetamine from someone, it lends to the conclusion that she didn't purchase it from him. With respect to these other individuals and the deliveries that were referred to through the first of the year, the deliveries themselves don't equate to distribution. Again, if Mr. Knutson was keeping some of the methamphetamine that was received for himself and doing whatever he wanted with it, that's his prerogative. Now I agree or I concede at least the fact that part of the conversation was about if he sold some of the meth that he kept, he might come back and give it to my client. That doesn't indicate a conspiracy to distribute methamphetamine on their part. More than that, when we're talking about that, the jury still has to speculate how much Mr. Knutson was going and selling. I just don't believe that the jury's verdict here reaches the level of beyond a reasonable doubt. I think it's clear that they had to speculate and fill in the blanks that were missing in this case. And unless the Court has any questions, I would just ask that you reverse the decision of the district court in this case. Thank you, Mr. Cogley. Thank you, Your Honor. The matter is submitted and taken under advisement and we'll render an opinion in due course. Thank you very much for your time here today, gentlemen.